# ORIGINAL

1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  BONNY E. SWEENEY (176174)
   DAVID W. MITCHELL (199706)
3  CARMEN A. MEDICI (248417)
   655 West Broadway, Suite 1900
4  San Diego, CA  92101
   Telephone:  619/231-1058
5  619/231-7423 (fax)
   bonnys@csgrr.com
6  davidm@csgrr.com
   cmedici@csgrr.com
7
   Attorneys for Plaintiff
8

FILED

2009 SEP 30  PM 2: 55

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLBY GILES, Individually and on Behalf of All Others Similarly Situated, | No. '09 CV 2 1 4 6 BEN  POR |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | COMPLAINT FOR VIOLATION OF §1 OF THE SHERMAN ACT |
| GUITAR CENTER, INC. and NATIONAL ASSOCIATION OF MUSIC MERCHANTS, INC., | |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1       Plaintiff Colby Giles, a purchaser of two guitars and assorted accessories from Guitar Center

2  during the Class Period, brings this action individually and on behalf of a Class consisting of all

3  persons and entities that purchased an acoustic or electric guitar, drum sets, keyboard, mixer,

4  amplifier or related accessory ("Music Products") directly from a defendant or a co-conspirator.

5  Plaintiff makes the allegations in this Complaint on information and belief, except as to the

6  allegations pertaining to plaintiff, which is based on personal knowledge.

7                          **NATURE OF ACTION**

8      1.     On, March 4, 2009, the FTC announced defendant National Association of Music

9  Merchants ("NAMM"), a musical industry trade association, entered into a consent order settling

10  charges that NAMM violated federal antitrust law by enabling and encouraging the exchange of

11  competitively sensitive price information among its members.

12      2.     During the Class Period, Guitar Center, NAMM and NAMM's members conspired,

13  combined and contracted to fix, maintain, stabilize and set minimum agreed-upon resale prices in the

14  Music Products market.  As a result of this unlawful conduct, plaintiff and the Class paid

15  supracompetitive prices for these products and have suffered injury to their business and/or property.

16      3.     NAMM encouraged, facilitated and coordinated the exchange of competitively

17  sensitive information between its members.  In the late 1990s, NAMM's retail members, including

18  defendant Guitar Center, saw their profit margins being cut away by new entrants into the Music

19  Products industry.

20      4.     In order to protect their market share, NAMM and its retail members entered into an

21  agreement and conspiracy to influence NAMM's manufacturing members to set minimum advertised

22  prices ("MAP") for Music Products.  Because of Guitar Center and other NAMM retail members'

23  purchasing power, the manufacturers had no choice but to accept the imposition of MAP policies.

24      5.     Soon thereafter, in the late 1990s and early 2000s, manufacturers realized MAP

25  policies were an effective means of controlling prices at supracompetitive levels.  Manufacturers

26  then became involved in the NAMM-facilitated discussions and came to agreements and were a part

27  of the conspiracy with retail members regarding the anticompetitive MAP policies.

28

6.     These agreements had the purpose and effect of diminishing and/or eliminating competition on price allowing Guitar Center and other NAMM members to obtain supracompetitive profits and market share.

## JURISDICTION AND VENUE

7.     Plaintiff brings this action pursuant to §1 of the Sherman Act, 15 U.S.C. §1, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the antitrust injuries sustained by plaintiff and members of the Class.

8.     Plaintiff also seeks injunctive relief against defendants to prevent them from further violations of §1 of the Sherman Act, 15 U.S.C. §1, and pursuant to §16 of the Clayton Act, 15 U.S.C. §26.

9.     Jurisdiction in this Court is proper under 28 U.S.C. §§1331 and 1337, and §§4(a) and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26).

10.     Venue is proper in this Judicial District pursuant to 15 U.S.C. §§15(a) and 22 and 28 U.S.C. §1391(b), (c) and (d) because during the Class Period, defendants resided, transacted business, were found and/or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

11.     This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacted business throughout the United States, including in this District; (b) sold Music Products throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal price-fixing conspiracy and resale price maintenance scheme that was directed at and had the intended effect of causing injury to persons residing in, located in or doing business throughout the United States, including this District.  Further jurisdictional contacts are alleged below.

## PARTIES

12.     Plaintiff Colby Giles is a California resident living in San Diego, California.  During the Class Period, Mr. Giles purchased two guitars from Guitar Center.

- 2 -

13.     Defendant Guitar Center, Inc. is a Delaware corporation headquartered in Westlake Village, California. Guitar Center is the largest seller of Music Products in the United States with annual sales in 2008 of $1.55 billion in the $7 billion Music Products industry. In 2007, Guitar Center was nearly five times the size of its nearest competitor. From 1997 to 2007, its share of the Music Products industry grew from 6.1% to 26.6%. Guitar Center claims to be the nation's top retailer of guitars, amplifiers, drums, keyboards and pro-audio equipment, and operates more than 210 stores in about 40 states. Guitar Center is the largest customer of many of its suppliers and manufacturers and thus, each manufacturer depends on Guitar Center for a substantial portion of its sales of Music Products.

14.     Defendant National Association of Music Merchants, Inc. is a New York corporation headquartered in Carlsbad, California. NAMM is a trade association composed of more than 9,000 members including manufacturers, distributors and dealers ("dealers" is used interchangeably with "retailers" throughout the Complaint) of musical instruments and related products. Most United States manufacturers, distributors and dealers of musical instruments are members of NAMM. NAMM is controlled by its members, including Guitar Center. In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet with dealers. NAMM's trade shows provide competitors an opportunity to meet and discuss issues of concern to the industry.

CO-CONSPIRATORS

15.     Various other persons, firms, corporations and entities have participated with defendants as unnamed co-conspirators in the violations and conspiracy alleged in this Complaint. In order to engage in the offenses alleged, these co-conspirators have performed acts and made statements in furtherance of the defendants' antitrust violations.

CLASS DEFINITION

All persons or entities that purchased Music Products in the United States directly from defendants or defendants' co-conspirators from January 1, 1999 to February, 1, 2008 (the "Class Period"). Excluded from the Class are United States government entities and instrumentalities of the United States government, defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

16. Plaintiff does not know the exact size of the proposed Class as that information is in control of the defendants, but plaintiff believes there are at least thousands of Class members located throughout the United States, making the Class so large and geographically diverse that joinder is impracticable.

17. Defendants' anticompetitive conduct has imposed a common antitrust injury on members of the Class.

18. Defendants have acted, and refused to act, on grounds generally applicable to the Class, which makes final injunctive relief with respect to the Class as a whole appropriate.

19. Plaintiff is a member of the Class and plaintiff's claims are typical of other members of the Class who likewise sustained antitrust injury and were damaged through defendants' actions.

20. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff purchased Music Products from defendants and has a common and non-antagonistic interest in recovering damages caused by defendants' anticompetitive conduct and in enjoining and deterring future unlawful activity in the Music Product market.

21. Plaintiff has retained counsel experienced in antitrust and other complex class action litigation.

22. Defendants' anticompetitive conduct has uniformly affected plaintiff and members of the Class. Common questions of law and fact will predominate over individual questions of law and fact. Among questions of law and fact common to the Class are the following:

(a) Whether defendants and others combined, conspired or contracted to fix or set Music Products prices at artificially high levels;

(b) Whether defendants and others combined, conspired or contracted to impose MAP policies on the industry;

(c) The dates and formation of this illegal combination, contract, conspiracy or agreement;

(d) The identities of the participants in the illegal combination, contract, conspiracy or agreement;

(e) The manner and means of the conspiracy;

- 4 -

1    (f)    Whether, and to what extent, defendants' conduct violated §1 of the Sherman

2  Act;

3    (g)    Whether, and to what extent, defendants and their co-conspirators fraudulently

4  concealed their illegal combination, contract, conspiracy and other antitrust violations;

5    (h)    Whether Class members have suffered injury to their business and property as

6  a result of defendants' unlawful conduct, including the degree to which prices paid for by the Class

7  for Music Products were higher than those that would have been paid in a market free from illegal

8  combination, contract, conspiracy and other antitrust violations; and

9    (i)    The appropriateness of injunctive relief to restrain future violations.

10    23.    A class action is superior to other available methods for the fair and efficient

11  adjudication of this controversy. Class treatment will permit a large number of similarly situated

12  persons and entities to adjudicate their common claims in a single forum simultaneously, efficiently

13  and without duplication of effort and expense that numerous individual actions would engender.

14  Prosecution of separate actions by individual plaintiffs would create a risk of inconsistent or varying

15  adjudication. The proposed Class presents no difficulties of management that would preclude its

16  maintenance as a class action. No superior alternative exists for the fair and efficient adjudication of

17  this controversy.

18                    **INTERSTATE TRADE AND COMMERCE**

19    24.    Defendants and their co-conspirators sell Music Products in the United States.

20    25.    During all or part of the Class Period, the conduct of defendants and their co-

21  conspirators has taken place in and/or substantially affected interstate trade and commerce of the

22  United States.

23                    **FACTUAL ALLEGATIONS**

24  **Background**

25    26.    Most United States manufacturers, distributors and dealers of Music Products are

26  members of NAMM. As the FTC stated in its complaint against NAMM:

27    NAMM serves the economic interests of its members, by *inter alia*, promoting
    consumer demand for musical instruments, lobbying the government, offering
28    seminars, and organizing trade shows. In the United States, NAMM sponsors two

major trade shows each year, where manufacturers introduce new products and meet with dealers. In addition, NAMM's trade shows provide competitors an opportunity to meet and discuss issues of concern to the industry.

27.     NAMM's biannual trade shows are considered an indispensable resource by Music Product retailers. In a February 2007 interview, a member was quoted in Musical Merchandise Review:

> Many years ago, the importance of attending a NAMM show may not have seemed important, today it is absolutely necessary. Owners and key personnel should be at NAMM . . . the education seminars are priceless!

> The interaction with the industry people and colleagues is also priceless.

28.     According to independent retailers, Guitar Center wields enormous power in the industry. In an interview in the April 2007 issue of Musical Merchandise Review, Alan Levin of Chuck Levin's Washington Music Center said:

> The biggest concern is Guitar Center. They are many manufacturers' biggest customers and changes are being made . . . to suit them alone.

Similarly, one NAMM member observed: "Guitar Center has too much leverage . . . ."

29.     In a "virtual roundtable," retailer Frank Hayhurst of Zone Music responded to a question about the "un-level" playing field between Guitar Center and independents saying, "[a]s big as GC [Guitar Center] is, what's a little manufacturer to do? Not surprisingly, they do what GC demands."

30.     Relative to Guitar Center and most other retail members of NAMM, internet based retailers are small companies. Internet retailers of Music Products are highly efficient competitors because, among other reasons, their operating expenses are low. This allows them to compete vigorously on price, both with other internet retailers and with retailers in other sales channels, such as Guitar Center (which operates through "brick-and-mortar" stores as well as on the internet). Thus, when allowed to compete freely, internet retailers' price competition enhances consumer welfare by bringing down prices.

31.     In the "virtual roundtable," retailer Frank Hayhurst of Zone Music stated "[t]he internet has blown away selection and price as variables that make an m.i. [music industry] retailer unique, and 'service' doesn't have the terrific 'value added' impact upon the customer that many of

- 6 -

1  us have attributed to it.  If something breaks, they want to know if you'll replace it, not hear about

2  your repair department."

3       32.     Guitar Center and other large merchants felt the pressure in the form of price

4  competition not only from the internet retailers, but the "big box" and wholesale retailers as well,

5  including stores such as Wal-Mart, Best Buy and Costco.

6       33.     By the late 1990s, NAMM, Guitar Center and its members recognized that the

7  increased popularity of internet and big box retailers, with the associated increase in price

8  competition, posed a substantial threat to NAMM members' sales and profits.  Thus, NAMM, whose

9  retail members are primarily brick-and-mortar retailers, considered ways to thwart internet retailer

10  competitors.

11       34.     NAMM's and its members' response to internet retailing was both predictable and

12  anticompetitive.  As recognized at an FTC 2002 public workshop, entitled "Possible Anticompetitive

13  Efforts to Restrict Competition on the Internet," one expert explained:

14            The promise of the world of electronic commerce is to create an environment
            where consumers can freely shop between various competitive alternatives.  By
15            reducing transaction costs and improving transparency, the Internet offers the
            potential of dramatically improving competition in various retail markets.
16
                            *       *       *
17
            [But] as new market forces arise, . . . "traditional" competitors often respond to the
18            threat by trying to create barriers to thwart those entrants."

19  **During the Class Period, NAMM Provided a Means for Suppliers**
   **and Retailers To Control Prices for Music Products in the United States**
20
21       35.     Commencing in 1999 and continuing thereafter, numerous leading Music Products

22  manufacturers in conjunction with and through NAMM and its dealer members adopted MAP

23  policies.

24       36.     The purpose of facilitating agreement both as to MAP policies and pricing was

25  because Guitar Center, as well as other retailer members of NAMM, were concerned about increased

26  competition by mass merchants, such as Best Buy, Wal-Mart and Costco, as well as internet

27  retailers.

28

37.     In the late 1990s or early 2000s, at a NAMM show, "a high-profile retailer delivered a stinging address, lamenting the fact that manufacturers sat by idly as price wars raged and retail profits plummeted." This address coincided with the adoption of MAP policies by leading Music Product manufacturers, which commenced in 1999 and continued thereafter.

38.     By the early 2000s, several major music retail chains, including Guitar Center, expressed a heightened concern for margin and profit protection.

39.     When NAMM, Guitar Center, and other retail members encouraged and required the implementation of MAP pricing, manufacturers did so for fear of losing Guitar Center as a customer.

40.     In fact, a major shift in retail opinion regarding the effectiveness of MAP policies to protect profits occurred between 2000 and 2001. A poll conducted by Music Trades magazine revealed that:

> Last year [2000] when we polled leading m.i. [music industry] dealers about the value of minimum advertised price (MAP) policies, only 31% said they had a positive effect on gross margins. 60% responded that MAP had no effect at all on selling prices, while 9% said the programs actually decreased margins. When asked the same question this year [2001], retailers expressed a major change of heart. 51% said that MAP policies had improved their gross margins during the past 12 months, and only 44% deemed the policies in ineffectual.

41.     Music Trades concluded that the 20-point shift in opinion was due to the fact that "the biggest benefit of MAP policies has been to rid the internet of loss-leader pricing." Music Trades explained:

> As a result [of MAP policies], these days when you type the name of a popular product into a search engine, you'll get a screen full of results offering the same MAP regulated price. As our poll indicates, brick-and-mortar retailers obviously appreciate the fact that they don't have to deal with a legion of customers coming into the store brandishing a computer print out and demanding, "Why can't you beat this price."

42.     In addition to reducing competition from internet retailers, Music Trades also credited MAP policies with a more "sane approach to industry pricing," stating that "retail margins appear to have stabilized."

43.     Accordingly, MAP policies were a hot topic at the January 2001 NAMM trade show. Music Trades reported that retailers' then-current gross margins of 28% to 32% were far lower than

1  they had been in the 1990s, and that both large and small retailers "have jointly concluded that they

2  simply can't afford to give up any more gross margin points."

3      44.    In response to this joint retailer pressure, at the January 2001 NAMM show,

4  "manufacturers seemed to be doing more than paying lip service to retail profit concerns" by rolling

5  out new and more restrictive MAP policies.  However, the manufacturers acknowledged that the

6  MAP policies were not designed to increase services at the retailers but merely to protect their profit

7  margins. In fact, manufacturers allegedly "[were] fulsome in their criticisms of the industry's retail

8  network," stating, *inter alia*: "They don't do any marketing," and "[t]heir stores are staffed with

9  minimum wage idiots."

10     45.    Thus, the discussion at the January 2001 NAMM show was driven by manufacturers'

11  realization that they could no longer rely on innovative engineering and design.  Instead, to

12  artificially increase profits, manufacturers agreed to implement "[a] distribution scheme that enables

13  retailers to make a respectable gross margin . . . . "

14     46.    At the January 2002 NAMM show, NAMM continued to facilitate discussion among

15  its members on the use of MAP policies.  As a result, manufacturers "acknowledged the retail

16  concern with profitability by instituting minimum advertised price, or MAP policies.  In fact,

17  mention of MAP pricing was routinely included in just about every new product presentation."

18     47.    At these shows, NAMM encouraged manufacturers to and manufacturers agreed to

19  and did outline their MAP policies. But the manufacturers did not do so in conjunction with requests

20  for retailer advertising, in-store displays, better product demonstrations or knowledgeable store staff.

21  Rather, the MAP policies were agreed to at the behest of defendants and rolled out at the NAMM

22  shows with retailer profitability in mind.

23     48.    For example, at the summer 2004 NAMM show, "[a] number of exhibitors also

24  announced higher MAP prices in a bid to shore up dealer margins.  As one supplier noted, 'The truth

25  is, there isn't a lot of difference between our products and our competitors.  If we're going to get

26  dealer support, we've got to make these guys money.'"

27     49.    Similarly, at the NAMM show in summer 2005, manufacturer Peavey Electronics

28  (among others) outlined its MAP policy, reiterating "Peavey's commitment to dealer profitability."

50.     But NAMM did not simply encourage individual manufacturers and dealers to discuss and agree how to restrict price competition. In fact, it facilitated joint discussions by all members of NAMM.  At NAMM's biannual trade shows and conventions, NAMM hosted "NAMM Show University Sessions."  These sessions were designed to facilitate discussion and education on a wide variety of music industry topics, including price competition and restrictions to competition.

51.     At the January 2006 trade show, NAMM hosted several events regarding MAP policies.

52.     For example, NAMM facilitated a panel discussion regarding MAP policies. On a panel comprised of industry heavy-hitters, including the Vice President and General Manager of Yamaha's Pro-Audio and Combo division, sales managers from Avedis Zildjian and Kaman Music Corp. and several other retailers, the suppliers were "unanimous, offering a guardedly positive assessment of MAP policies."

53.     At this panel, there was just one lone voice that supported competition on prices. Bryan Junk of www.massmusic.net asked the Panel and the audience, "We're supposed to compete, aren't we?"  According to one industry report of the Panel session:

> Whether or not you agree with him, Bryan Junk, an internet retailer, deserves credit for staring down an auditorium packed with independent retailers and stating that MAP should be scrapped.  To audible boos, he declared, "Consumers like low prices, and we try to give them what they want. Why shouldn't we be able to grow our business by offering the lowest prices possible without interference from the manufacturers?"

54.     However, Mr. Junk's view was not the consensus.  In fact, the panel discussed that, absent MAP, "prices would rapidly migrate down to 10% over cost. . . ."  The panel even advocated revising the current MAP pricing "upwards to give retailers a better profit margin."

55.     The panel also discussed how to enforce the MAP policies, particularly with the proliferation of internet retailers, agreeing that "MAP is only as effective as its enforcement. . . ."

56.     NAMM also released a report based on comments it compiled from January 2006 trade show participants and attendees. NAMM released the following poll results, with answers:

> What do independent retailers view as a threat to their business and profitability? On a 1 to 5 scale, with 5 being extremely concerned, rate the following issues. (Report is average of responses.)

3.4     The expanded presence of music products in mass merchants, like Wal-Mart and Costco.

3.2     Competition from internet and catalog merchants.

\*          \*          \*

2.5     MAP pricing policies that set margins too low.

57.     NAMM hosted another session entitled, "Does The Industry Need A MAP Makeover?"   At this session, Music for Everyone ("MFE"), a California retailers association, presented a "voluntary MAP formula/guideline" which it "recommended for general use . . . ."

58.     MFE published and presented at the January 2006 NAMM trade show, with NAMM's participation and consent, the following two pricing formulas based on retail cost which were "designed for all instruments and all combo and audio products":

Proposed MAP Formula
Recommended Minimum Profit Formulas for A & B Discounts

\*          \*          \*

Retail [$1-$149] x 0.5 x 2.00 = MAP (0% off retail)*
Retail [$150-$249] x 0.5 x 1.90 = MAP (5% off retail)*
Retail [$250-$299] x 0.5 x 1.85 = MAP (7.5% off retail)*
Retail [$300-$349] x 0.5 x 1.80 = MAP (10% off retail)**
Retail [$350-$399] x 0.5 x 1.75 = MAP (12.5% off retail)**
Retail [$400-$449] x 0.5 x 1.70 = MAP (15% off retail)*
Retail [$450-$499] x 0.5 x 1.65 = MAP (17.5% off retail)*
Retail [$500 and up] x 0.5 x 1.60 = MAP (20% off retail)*
Retail [$550-$599] x 0.5 x 1.55 = MAP (22.5% off retail)**
Retail [$600 and up] x 0.5 x 1.50 = MAP (25% off retail)**

\* Formula A
\*\* Formula B

59.     MFE explained that the formulas were designed to permit "[f]ormula discounts from retail start[ing] at zero" and to provide a "much higher" profit percentage for lower-priced products.

60.     MFE even went so far at the NAMM show to encourage manufacturers to adopt the MAP pricing reflected in Formula A, capping permitted discounts at 20% and stating that Formula A "is likely to be . . . accepted widely."   Nonetheless, MFE stated that no MAP pricing should be lower than that reflected in Formula B, stating "the formula B profits are the minimum that brick-and-mortar full service music instrument retailers require to survive, and hopefully thrive."

61.   At the 2006 Summer NAMM show, NAMM again held an industry panel discussion, comprised of the NAMM President, a Vice President of Yamaha and the Chairman and CEO of Fender Musical Instruments, among others. NAMM touted this roundtable as follows: "In the two-hour session suppliers and retailers of all sizes will be able to share views about critical issues affecting profitability, including MAP pricing, Interact sales tax, and the entrance of mass consumer merchandisers into the industry." Among other topics, MAP prices being set too low and maintenance of profit margins were discussed.

62.   NAMM continued to facilitate industry discussions of MAP pricing at its 2007 winter show. One roundtable discussion focused on, *inter alia*, increasing profit margins and MAP pricing.

63.   Thus, NAMM again organized meetings and programs for its members at which competing retailers of Music Products, as well as manufacturers of those Music Products, were permitted and encouraged to exchange information and discuss strategies for implementing MAP policies, the restriction of retail competition and the need for higher retailer prices. Representatives of NAMM determined the scope of information exchange and discussion by selecting the moderator and setting the agenda for these programs.

64.   At these NAMM-sponsored events, NAMM members discussed the adoption, implementation and enforcement of MAP policies, the details and workings of such policies, appropriate and optimal retail price and margins and other competitively sensitive issues.

65.   The prevalence of MAP policies in the Music Products industry remained steady into early 2008. In an article from the February 1, 2008 issue of Music Trades, retailer Mike Henry, owner of Percussion Center stated:

> When products are seen to be "Wal-Mart" cheap, it cheapens the industry. MAP supports the public's perceived value of the products we're trying to sell competitively and still make a living. I'm all for competition and the American way, but if retailers can't make a profit, what's the point of being in business.

Later in the article, Mr. Henry continued:

> In the long run, a manufacturer that doesn't enforce its MAP isn't going to hurt my business, it's going to hurt their business because I'm going to stop buying from them. I'm their customer; I'm paying their salaries by buying their products. If they allow my competitors to sell their product at a price that doesn't give me a reasonable margin, I can't buy it.

1   Mr. Henry went on to say that "[a] product's MAP price should be based on its perceived retail

2   price."

3       66.      In the same article, Fred Bernardo of Fred's Music & Barbecue Supply stated that

4   "[MAP policies] are too low.  They don't allow for the retailer to make an adequate profit.  Also I

5   think MAP is illegal–or at least it was illegal.  It's price fixing, since everyone, especially online, has

6   the exact same 'selling' price on their shopping carts."  Mr. Henry and Mr. Bernardo's statements

7   underscore the continuing recalcitrant attitude of NAMM retail members, the anticompetitive nature

8   of MAP policies and the stark lack of precompetitive justifications for MAP policies.

9   **The FTC Action**

10      67.      On March 4, 2009, the Federal Trade Commission ("FTC") issued a cease and desist

11  order to NAMM and at the same time settled the FTC's charges that NAMM had "permitted and

12  encouraged" acts constituting violations of Section 5 of the FTC Act among its members and the acts

13  and practices of NAMM "constitute unfair methods of competition in or affecting commerce in

14  violation of Section 5 of the Federal Trade Commission Act, as amended 15 U.S. C. §45." The FTC

15  also alleged that absent appropriate relief "[s]uch acts and practices, or the effects thereof will

16  continue or recur . . . ."

17      68.      Specifically the FTC, after an investigation, alleged that between 2005 and 2007,

18  NAMM organized various meetings and programs for its members at which competing retailers of

19  Music Products were permitted and encouraged to exchange competitively sensitive information,

20  strategies for implementing minimum advertised pricing and restrictions of retail price competition.

21      69.      The FTC alleged that the "challenged conduct served no legitimate business purpose

22  and resulted in no significant efficiency benefits."

23      70.      According to the FTC's press release announcing NAMM's settlement of "FTC

24  Charges of Illegally Restraining Competitions," the FTC's proposed consent order "is designed to

25  remedy NAMM's anticompetitive conduct."  The Commission's vote to accept the complaint and

26  the consent order was 4-0.

27      71.      According to the FTC's complaint, "[a]t these NAMM-sponsored events, competitors

28  discussed the adoption, implementation, and enforcement of minimum advertised price policies; the

- 13 -

1   details and workings of such policies; appropriate and optimal retail prices and margins; and other

2   competitively sensitive issues."

3       72.     The conduct of defendants was the cause of supracompetitive price levels for Music

4   Products.  The October 2008 issue of Music Merchandise Review reported that Anthem Music

5   Group's head David Kilkenny observed "[o]ver the past several years instrument prices seem to be

6   increasing at a greater rate than that of inflation . . . . " According to the Music Trades "Annual

7   Census of the Music Industries" published in 2009, in 2006 the average price of a guitar was

8   $309.00, by 2007 the average price was $350.00 and by 2008 the average price was $372.00.  Thus,

9   defendants were able to increase aggregate sales from $1,022,861.00 in 2006 to $1,151,290.00

10  despite a 10% decline in unit sales.

11      73.     The FTC has alleged that no significant procompetitive benefit was derived from the

12  challenged conduct.  After analyzing the type of information involved, the level of detail, the

13  absence of procedural safeguards and overall market conditions, the FTC concluded that exchange of

14  information engineered by NAMM lacked a procompetitive justification.

15      74.     The FTC has ordered NAMM to cease and desist from:

16      (1)     Urging, encouraging, advocating, suggesting, coordinating, participating in,
        or facilitating in any manner the exchange of information between or among Musical
17      Product Manufacturers or Musical Product Dealers relating to:

18      (a)     the retail price of Musical Products; or

19      (b)     any term, condition or requirement upon which any Musical Product
        Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other
20      Musical Product Manufacturer or Musical Product Dealer, including but not limited
        to, Price Terms, margins, profits, or pricing policies, including but not limited to
21      Minimum Advertised Price Policies or Resale Price Maintenance Policies.

22      (2)     Entering into, adhering to, enforcing, urging, encouraging, advocating,
        suggesting, assisting or otherwise facilitating any Musical Product Manufacturer or
23      Musical Product Dealer to enter into, adhere to or enforce any combination,
        conspiracy, agreement or understanding between or among any Musical Product
24      Manufacturers or Musical Product Dealers relating to:

25      (a)     the retail price of any Musical Product;

26      (b)     any term, condition or requirement upon which any Musical Product
        Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other
27      Musical Product Manufacturer or Musical Product Dealer, including, but not limited
        to, Price Terms, margins, profits, or pricing policies, including but not limited to
28      Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

- 14 -

(c)     the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

## DEFENDANTS' ANTITRUST VIOLATIONS

75.     Beginning at least as early as January 1, 1999 and continuing until at least February, 1, 2008, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix maintain and/or stabilize the price for Music Products in the United States.

76.     In formulating and implementing their unlawful contract, combination or conspiracy, defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain and/or stabilize the price of Music Products in the United States.  These activities include the following:

(a)     Defendants participated in meetings and/or communications to discuss the pricing of Music Products;

(b)     Defendants agreed during those meetings and/or communications to force suppliers to charge and/or advertise prices at specified levels and otherwise to increase and/or maintain prices of Music Products in the United States; and

(c)     Defendants then implemented, adhered to and oversaw the agreements they reached.

77.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

78.     During the Class Period, plaintiff and members of the Class purchased Music Products from defendants, their subsidiaries or affiliates, or their co-conspirators at inflated and supracompetitive prices.

79.     As a result of defendants' unlawful conduct, plaintiff and other members of the Class have been injured in their business and property in that they have paid more for Music Products than they would have paid in a competitive market.

80.     The unlawful contract, combination or conspiracy has had the following effects, among others:

(a)     Price competition in the markets for Music Products has been artificially restrained;

(b)     Prices for Music Products sold by defendants have been raised, fixed, maintained or stabilized at artificially high and supracompetitive prices; and

(c)     Purchasers of Music Products from defendants have been deprived of the benefits of free and open competition in the markets for Music Products.

81.     Defendants' contract, combination or conspiracy constitutes an unreasonable restraint on interstate trade and commerce in violation of §1 of the Sherman Act.

82.     The aforementioned anticompetitive effects of defendants' conduct on competition in the relevant market outweigh any conceivable procompetitive benefits.

**Relevant Market**

83.     The relevant product market in this case is retail sales of Music Products which includes acoustic or electric guitars, drum sets, keyboards, mixers, amplifiers and related accessories.

84.     The relevant geographic market in this case is the United States of America.

85.     By virtue of their power to control prices and exclude competition in the relevant market, defendants at all relevant times possessed market power in the relevant market. Moreover, at all relevant times defendants possessed dominant shares of the market for retail sales of Music Products.

86.     Likewise, defendants at all relevant times possessed substantial power in the market for Music Products. Specifically, defendants: (a) sold their musical instruments and assorted accessories at prices substantially in excess of marginal costs; (b) enjoyed high profits margins thereon; and (c) sold such products substantially in excess of the competitive price.

87.     Defendants exchanged competitively sensitive information that had the purpose, tendency and capacity to facilitate price coordination among competitors.

88.     There is substantial concentration among the firms that manufacture and sell the products in the relevant market.

89.     Together defendants imposed and enforced minimum retail price maintenance and MAP policies which were contrary to manufacturers' economic interests because each manufacturers' rational economic goal was to increase sales volume rather than terminate retailers.

**Market Effects of Defendants' Conduct**

90.     The overall effect of defendants' anticompetitive, exclusive scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced Music Products. As alleged above, had defendants not improperly foreclosed or stifled actual or potential competitors from competing in markets for Music Products, other actual or potential rival manufacturers would have achieved much greater sales than they actually did (or threatened to do), given the cheaper prices that they charged (or could have charged upon entry), and would have posed a far greater competitive threat to defendants. As a result, absent defendants' misconduct, defendants would have rationally perceived that there was a greater threat of potential competition in each of the relevant markets if defendants did not reduce its supracompetitive prices.

91.     The presence of unfettered competition from actual or potential competitors, which were selling lower-priced Music Products, would have forced defendants to lower the prices for its Music Products in order to remain competitive and/or counter a perceived threat of additional entry.

92.     As a result of defendants' conduct, independent retailers could not compete with nationwide and/or multiregional claims because the retailers could not price-compete. Accordingly, retailers such as Guitar Center were able to raise prices above and beyond what they would be under competitive conditions.

93.     During the Class Period, plaintiff and other members of the Class purchased Music Products directly from defendants. As a result of defendants' alleged illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the Music Products they purchased. Plaintiff would have been able to, *inter alia*, purchase less-expensive Music Products had potential competitors been able to engage in unfettered competition. The prices that plaintiff and the other Class members paid for Music Products during the Class Period were substantially greater than the prices that plaintiff and the Class members would have paid absent the illegal conduct alleged herein because: (1) the prices of all Music Products were artificially inflated by

- 17 -

1    defendants' illegal conduct; and (2) Class members were deprived of the opportunity to purchase

2    Music Products at substantially lower prices.  Thus, plaintiff and the Class have, as a consequence,

3    sustained substantial damages in the form of overcharges.

4    **Anticompetitive Effects of Defendants' Unlawful Conduct**

5        94.    The MAP policies imposed and enforced by defendants here went well beyond

6    typical cooperative advertising programs where manufacturers place restraints on the prices dealers

7    may advertise in advertisements funded in whole or in part by the manufacturer.

8        95.    The MAP policies imposed on manufacturers by music retailers and NAMM are

9    anticompetitive.  According to a Wall Street Journal article, dated October 23, 2008, Bradley Reed,

10    sales manager for Musician's Advocate, Inc. said "it [his company] has very little choice but to

11    honor manufacturers' policies on advertised prices because otherwise it risks having its supplies cut

12    off or being delisted as an authorized distributor."

13        96.    In large part, NAMM's concerted efforts were successful. Despite the fact that

14    NAMM and its members expressed their fear at the January 2001 NAMM trade show that the then-

15    current gross margins of 28% to 32% would be chipped away even further by price competition,

16    Music Trades report published in 2008 provided that the music industry maintained large gross

17    margins of 30% versus approximately 22% gross margins for the traditionally high-margin consumer

18    electronics industry.

19        97.    Defendants' conduct caused actual antitrust damage to purchasers of Music Products

20    in the form of higher prices and diminished price competition.

21        98.    The aforementioned anticompetitive effects of defendants' conduct on competition in

22    the relevant market outweigh any conceivable procompetitive benefits.

23    **FRAUDULENT CONCEALMENT IN FURTHERANCE OF THE CONSPIRACY**

24        99.    Plaintiff had no knowledge of the anticompetitive conduct alleged in this Complaint,

25    or of any facts that might have led to its discovery in the exercise of reasonable diligence, prior to

26    the FTC's March 2009 press release detailing the consent order that it entered into with defendant

27    NAMM.

28

100.   Defendants and their co-conspirators employed deceptive practices to conceal their conspiracy.

101.   As a result of defendants' fraudulent concealment of the conspiracy, plaintiff asserts the tolling of the applicable statute of limitations affecting the causes of action by plaintiff and the members of the Class.

**COUNT**

**VIOLATION OF §1 OF THE SHERMAN ACT**

102.   Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs of this Complaint.

103.   Beginning at least as early as January 1, 1999 and continuing to February 1, 2008, defendants and their co-conspirators, by and through their officers, directors, employees, agents or other representatives, entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain and/or stabilize prices for Music Products in the United States in violation of §1 of the Sherman Act, 15 U.S.C. §1.

104.   Defendants' unlawful conduct resulted in artificially high prices charged by defendants and their co-conspirators to plaintiff and the members of the Class for Music Products.

105.   As a result of defendants' unlawful conduct, plaintiff and members of the Class have paid and continue to pay more for Music Products than they would have paid in a competitive marketplace.

106.   Plaintiff seeks to recover for these overcharge damages.

107.   As a direct and proximate result of defendants' scheme, plaintiff and members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined. Plaintiff's injuries consist of paying higher prices to purchase Music Products than it would have paid absent defendants' conduct. Plaintiff's injuries are the type the antitrust laws were designed to prevent and flow from defendants' unlawful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, individually and on behalf of all members of the Class, prays for a judgment:

- 19 -

1     A.    That the Court certify the Class pursuant to Federal Rules of Civil Procedure, Rule

2  23(b);

3     B.    That the Court find that the combination and conspiracy and other illegal activities

4  alleged in this Complaint be adjudicated a *per se* violation of, or alternatively, a rule of reason

5  violation of §1 of the Sherman Act, 15 U.S.C. §1;

6     C.    That plaintiff and the Class recover damages against each defendant, jointly and

7  severally, in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15;

8     D.    That plaintiff and the Class be awarded their expenses and costs of suit, including

9  reasonable attorneys' fees, to the extent provided by law;

10     E.    That this Court permanently enjoin unlawful activity by defendants in violation of the

11  antitrust laws; and

12     F.    That plaintiff and the Class be awarded such additional relief as the Court may deem

13  proper.

## JURY DEMAND

15     Plaintiff hereby demands a trial by jury.

16  DATED:  September 30, 2009        COUGHLIN STOIA GELLER
                            RUDMAN & ROBBINS LLP
17                          BONNY E. SWEENEY
                          DAVID W. MITCHELL
18                          CARMEN A. MEDICI

20                            _____
                                DAVID W. MITCHELL

22                        655 West Broadway, Suite 1900
                        San Diego, CA  92101
                        Telephone: 619/231-1058
23                        619/231-7423 (fax)

24                        **Attorneys for Plaintiff**

28  S:\CptDraft\Antitrust\Cpt Guitar Ctr.doc

ORIGINAL

⚜ JS 44   (Rev. 12/07)                            CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| COLBY GILES, Individually and on Behalf of All Others Similarly Situated, | GUITAR CENTER, INC. and NATIONAL ASSOCIATION OF MUSIC MERCHANTS, INC. |

2009 SEP 30  PM 2: 55

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DM _____

(b)   County of Residence of First Listed Plaintiff   San Diego, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   West Lake Village, CA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c)   Attorney's (Firm Name, Address, and Telephone Number)
David W. Mitchell, Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900, San Diego, CA 92101

Attorneys (If Known)

'09 CV 2146 BEN          POR

| II.  BASIS OF JURISDICTION   (Place an "X" in One Box Only) | | III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff |
|---|---|---|

(For Diversity Cases Only)                          and One Box for Defendant)

| | | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question (U.S. Government Not a Party) | | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity (Indicate Citizenship of Parties in Item III) | | Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| | | | | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | PERSONAL PROPERTY | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | LABOR | SOCIAL SECURITY | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | IMMIGRATION | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

**V.  ORIGIN**   (Place an "X" in One Box Only)

| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|

**VI.  CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. S. 1
Brief description of cause:
Complaint for Violation of Section 1 of the Sherman Act

| VII.  REQUESTED IN COMPLAINT: | ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND:  ☒ Yes   ☐ No |
|---|---|---|---|

| VIII.  RELATED CASE(S) IF ANY | (See instructions): | JUDGE  Hon. Larry Alan Burns | DOCKET NUMBER  3:09-CV-02002-LAB-JMA |
|---|---|---|---|

DATE:
09/30/2009

SIGNATURE OF ATTORNEY OF RECORD
_DMitchell_

FOR OFFICE USE ONLY

RECEIPT #  5783       AMOUNT  $350.00       APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

MS  9/30/09

UP

Court Name: USDC California Southern
Division: 3
Receipt Number: CAS005783
Cashier ID: msweaney
Transaction Date: 09/30/2009
Payer Name: COUGHLIN STOIA GELLER
------------------------------------
CIVIL FILING FEE
  For: COLBY GILES V GUITAR CENTER
  Case/Party: D-CAS-3-09-CV-002146-001
  Amount:        $350.00
------------------------------------
CHECK
  Check/Money Order Num: 69004
  Amt Tendered:  $350.00
------------------------------------
Total Due:       $350.00
Total Tendered:  $350.00
Change Amt:      $0.00


There will be a fee of $45.00
charged for any returned check.